# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **DEBORAH R. LOWREY.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:09cv0519 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Deborah R. Lowrey's application for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the Court[1] for a final disposition. Ms. Lowrey (Plaintiff) has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB on May 18, 2006, alleging she was disabled as of March 31, 2002, by costochondritis[2]; complex regional pain syndrome (CRPS), also known as reflex

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]Costochondritis is "[i]nflammation of one or more costal ['[r]elating to a rib'] cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate . . . ." Stedman's Medical Dictionary, 403 (26th ed. 1995) (Stedman's).

sympathetic dystrophy syndrome (RSD)[3]; vision loss in the left eye; function loss in both arms and hands; osteophytic spurring; shoulder degeneration; and degeneration of the sternoclavicular[4] joint. (R.[5] at 200-01.) Her application was denied initially and after a hearing held in December 2008 before Administrative Law Judge ("ALJ") Michael D. Mance. (Id. at 5-71.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Vincent Stock, a vocational expert (VE), testified at the administrative hearing. A friend of Plaintiff's, Annette Ehlmann, was present but did not testify.

---

[3]CRPS is a "chronic pain condition. The key symptom of CRPS is continuous intense pain out of proportion to the severity of the injury, which gets worse rather than better over time. CRPS most often affects one of the arms, legs, hands, or feet." National Institute of Neurological Disorders and Stroke, NINDS Complex Regional Pain Syndrome Information Page, http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sympathetic_dystrophy.htm (last visited Sept. 9, 2010). There is no cure; rather, treatment, including physical therapy, anesthetic or pharmacolgic blockade of sympathetic nerve function, and medication, focuses on relieving the pain. Id.; Merck Manual of Diagnosis and Therapy, 1418 (16th ed. 1992).

[4]Sternoclavicular "[r]elat[es] to the sternum [the breast bone] and clavicle [collar bone]." Stedman's at 350, 1676.

[5]References to "R." are to the administrative record filed by the Commissioner with his answer.

Plaintiff testified that she was then forty-five years old.[6]  (Id. at 22.)  She has some college education.[7]  (Id.)  She had been living in a hotel for the past two days after breaking up with her boyfriend.  (Id. at 22, 41-42.)  She is right-handed.  (Id. at 26.)

Plaintiff last worked on March 31, 2002, when she was injured when working as a night stocker at Wal-Mart.  (Id. at 22, 26.)  She was lifting a box of mouthwash approximately two inches to place it more securely on other boxes when she heard a pop and felt pain going down her left arm and hand.  (Id. at 34-35.)  Doctors have told her that her problems with her right arm and hand are from overuse caused by compensating for the left.  (Id. at 35.)  The overuse and "any small thing" sets off the CRPS.  (Id.)

After her injury, she went to see a chiropractor because she could not get into see her regular doctor.  (Id.)  When she did see her doctor, Dr. Bhalla,[8] the doctor told her to keep going to the chiropractor because there was nothing that traditional medicine could do for her.  (Id. at 36.)  Dr. Bhalla did not give her a diagnosis, nor did the chiropractor.  (Id.)  Wal-Mart sent her to a workers' compensation doctor.  (Id.)  After she saw that doctor, Wal-Mart denied her treatment.  (Id. at 37.)  She also saw another doctor, Anthony Margherita, for her workers' compensation claim and a doctor, Larry Oteham,[9] who was recommended

---

[6]Plaintiff was born on December 2, 1963.  (Id. at 200.)

[7]Plaintiff testified in a deposition in her workers' compensation case that she had three semesters of college.  (Id. at 117-18.)

[8]Where, as here, there is a difference between the spelling of the doctor's name in the hearing transcript and in the medical records, the Court will employ the spelling in the records.

[9]See note 8, supra.

by her chiropractor.  (Id. at 39.)  Counsel referred her to Dr. Poetz,[10] who referred her to Dr. Smith for pain management.  (Id. at 40.)

Asked what kept her from working, Plaintiff explained that she has a lot of problems with her hands, arms, legs, ribs, and sternum.  (Id. at 22.)  Her problems started on March 31, 2002.  (Id. at 23.)  Everything Plaintiff does takes a lot of time.  (Id. at 24.)  She has to be very careful when moving because she falls down stairs and walks into things.  (Id. at 27.)  Also, she often has a hard time breathing because of pain in her chest and sternum.  (Id.)

Plaintiff cannot not walk very far without falling or having to hold onto something.  (Id. at 28.)  She tried to use a cane, but could not hold onto one.  (Id.)  She tries to stay against walls or near railings when she walks.  (Id.)  Sometimes, walking six to twelve feet can be a problem.  (Id.)  She cannot sit still or find a comfortable position when sitting.  (Id.)  She often cannot lift even the five pounds her doctors have told her is the maximum.  (Id. at 29.)  She drops things she picks up.  (Id. at 29, 43.)  She can write her signature or one or two sentences, but anything more is illegible.  (Id. at 43.)  She has difficulty keeping a pen in her hand.  (Id.)  She also has a hard time dialing a telephone or punching numbers on a telephone.  (Id. at 45.)  Her hands, hips, and thighs constantly feel a burning numbness.  (Id. at 44, 45.)  She has constant pain on her left side.  (Id. at 44.)  For the past four years, she has had back pain.  (Id. at 45.)  She sometimes has spasms and cramps in her legs and feet.  (Id.)  Her condition is aggravated by too much walking or standing or by sitting on

---

[10]See note 8, supra.

hard chairs. (Id. at 32.) Also, warm weather and cold weather cause different aggravations. (Id. at 32-33.) Plaintiff can sometimes raise her left arm to her waist, but often has to use her right hand to hold up the left arm. (Id. at 60.) She has difficulty stooping because once down, she needs help getting up. (Id.)

Her ophthalmologist has advised her not to drive because of an inflammation near her optic nerve. (Id. at 29.) She last saw him in 2004; her vision has not improved or changed. (Id.) His report that her vision could be corrected to 20/20 and 20/25 was separate from the problem with inflammation. (Id. at 29-30.) Because of her eye problem, she does not watch television but listens to it. (Id. at 30.) She saw the ophthalmologist only one time because she can not afford to follow up. (Id. at 30-31.) With her vision problems, she cannot tell where other cars or the lanes are and does not feel safe to drive. (Id. at 41.)

Plaintiff last saw a chiropractor in 2005. (Id. at 31.)

Plaintiff talked one time to a counselor over the telephone. (Id. at 32.) She does not have any mental problems. (Id.)

She is no longer seeing any doctors. (Id. at 24.) She does not take any medication and is allergic to aspirin. (Id. at 26.) Her doctors have told her that this allergy precludes every possible treatment because 85% of the medications are aspirin-based. (Id. at 49-50.) She also cannot take non-steroid anti-inflammatory drugs (NSAIDs). (Id. at 50.) She has had allergic reactions to prescription pain medications, including Neurontin. (Id.) Doctors have cautioned her about taking too much acetaminophen because it can be bad for her liver. (Id. at 51.)

Her health insurance was cancelled by Wal-Mart.  (<u>Id.</u> at 40.)

Sometimes Plaintiff needs help dressing and undressing when her clothing has buttons.  (<u>Id.</u> at 47.)  She can microwave prepared foods.  (<u>Id.</u> at 48.)  She needs help shopping.  (<u>Id.</u>)  She falls in the shower.  (<u>Id.</u>)  She can read for brief periods if she uses a super magnifying glass.  (<u>Id.</u> at 49.)  If she reads for too long, she gets sharp pains in her eyes.  (<u>Id.</u>)

Asked if she has trouble sleeping, Plaintiff explained that she sleeps when she can.  (<u>Id.</u> at 52.)

Plaintiff testified that she has spoken with past employers and, although they would like to help her, they cannot figure out any task that she can do.  (<u>Id.</u> at 53.)  She is very slow and cannot sit for long.  (<u>Id.</u>)  Moreover, a job would have to come to her or she would have to work from home with a lot of assistance.  (<u>Id.</u>)

Plaintiff still smokes less than half a pack of cigarettes a day, but she plans on quitting.  (<u>Id.</u> at 26.)

After Plaintiff concluded her testimony, the VE testified.  He classified Plaintiff's past work as an accounting clerk as the job is performed in the national economy as sedentary with an specific vocational preparation (SVP) of five[11]; as a buyer administrative assistant

---

[11]SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  <u>Dictionary of Occupational Titles: Appendix C – Components of the Definition Trailer</u>, 1991 WL 688702 (4th ed. Rev. 1991).  For instance, an SVP of three requires more than one month up to and including three months.  <u>Id.</u>  An SVP of six requires over one year up to and including two years.  <u>Id.</u>  An SVP of three to four corresponds to semi-skilled work and of five to nine corresponds to skilled work.  <u>Policy Interpretation Ruling:  Titles II and XVI:  Use of Vocational Expert and Vocational Specialist Evidence</u>, SSR 00-4p, 2000 WL

as light with an SVP of six; as a dispatcher as a sedentary with an SVP of four; as a latchkey childcare worker as light with an SVP of seven; as a night stock clerk as heavy with an SVP of four; as a pet groomer as a medium with an SVP of four; as a veterinarian technical assistant as a medium with an SVP of six; a temporary clerk as sedentary with an SVP of six; and as a technical contracting clerk as a sedentary with an SVP of seven. (<u>Id.</u> at 55.) The VE noted that these jobs as performed by Plaintiff were sometimes in a different exertional level than as performed in the national economy. (<u>Id.</u>) For instance, the jobs of pet groomer and veterinarian technical assistant as performed by Plaintiff were heavy level jobs and as performed in the national economy were medium level jobs. (<u>Id.</u>)

The ALJ then asked the VE the following question.

> Assume an individual the claimant's age, education level, past work experience. The individual is limited to performing what is defined as sedentary exertional level work. The individual is limited to occasionally climbing stairs and ramps, never climbing ropes, ladders, and scaffolds. Occasionally balancing, stooping, kneeling, crouching, and crawling. The individual should avoid extreme cold and, or concentrated exposure to extreme cold and extreme heat; avoid concentrated exposure to pulmonary irritants, industrial hazards and unprotected or unprotected heights and industrial hazards; and the individual is limited to performing simple tasks only. Could that individual perform any of the claimant's past work?

(<u>Id.</u> at 56.) The VE replied that such an individual could not perform any of Plaintiff's past relevant work because those jobs were at least an SVP of three and the individual was limited to SVPs of two or three. (<u>Id.</u>)

_____

1898704, *3 (S.S.A. Dec. 4, 2000).

There were, however, other jobs such an individual could perform. (Id. at 57.) Specifically, jobs as a wafer breaker semi-conductor and assembly line fabricator were at the sedentary level and existed in significant numbers in the local, state, and national economies. (Id.)

If such an individual also needed to rotate positions frequently and was limited in reaching in all directions, including overhead, the number of assembly line fabricator positions would be reduced by 25% but the wafer breaker jobs would not be affected. (Id. at 57-58.) If the reaching overhead was limited to no more than occasional, the assembly line fabricator jobs would not be available. (Id. at 58.) Also available would be security guard monitor positions. (Id.) If such an individual also required occasional unscheduled disruptions of the workday and workweek due to problems with chronic pain, there were no jobs available. (Id.)

Asked by Plaintiff's counsel if a person with the limitations described by Plaintiff could perform the wafer breaker job, a job which required the use of hand tools, including tweezers, the VE replied she could not. (Id. at 59.) Indeed, if Plaintiff's description of her limitations was accepted as true, there were no jobs she could perform. (Id. at 60.)

The VE further testified that the information he had provided was consistent with that in the DOT "and its companion publications." (Id. at 62.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from

various health care providers, and a copy of her deposition taken in her workers' compensation case.

When applying for DIB, Plaintiff completed a Disability Report. (Id. at 213-23.) She listed her height as 5 feet 6 inches and her weight as 160 pounds. (Id. at 213.) Her impairments – costochondritis, CRPS, a significant loss of vision in her left and of functioning in both arms and hands, significant osteophytic spurring, significant degeneration of her shoulders, and significant degeneration of her sternoclavicular joint – first interfered with her ability to work on March 31, 2002, and stopped her from working that same day. (Id. at 214.) These impairments affect every movement and cause her constant intense pain and difficulty concentrating. (Id.) In the past 15 years, she has had 16 jobs.[12] (Id. at 215-16.) Her longest job was as a senior fiscal clerk and was for 14 months. (Id.) This job required that she walk for six hours each day; stand for two; sit for four; reach for four; handle, grab, or grasp big objects for six; write, type, or handle small objects for eight; and climb, stoop, kneel, crouch, and crawl for one each. (Id. at 216-17.) The heaviest weight she lifted was 25 pounds. (Id. at 217.) Her doctors include Amita Bhalla, Anthony Margherita, Larry Oteham, and Robert Poetz. (Id. at 217-18.) The only doctor she still saw was Dr. Poetz, and she saw him for costochondritis and CRPS. (Id. at 218-19.) She has seen a chiropractor for 24 months. (Id. at 219.) The only medication she currently takes is extra-strength Tylenol. (Id. at 220.)

_____

[12]See also Work History Report. (Id. at 224-52.)

Plaintiff also completed a supplemental questionnaire.  (<u>Id.</u> at 257-60, 262-69.) Asked what activities or movements made her debilitating symptoms worse, Plaintiff listed the use of a computer mouse or keyboard, holding or grasping items, driving or riding in a car, wearing a bra, reading, writing, walking, and sitting for longer than fifteen minutes.  (<u>Id.</u> at 262.)  She needs assistance to walk, but can not use a cane because of the difficulty grasping it.  (<u>Id.</u> at 263.)  She uses a wall or railing or similar structure when walking to help her stay upright.  (<u>Id.</u>)  Vision problems make it difficult for her to read.  (<u>Id.</u> at 257.)  She can not use a checkbook, complete a money order, or count change due to difficulties handling small objects.  (<u>Id.</u> at 257, 264.)  She does not shop and the only meals she prepares are ones that only need to be microwaved.  (<u>Id.</u> at 265.)  She cannot do any household chores.  (<u>Id.</u> at 257.)  Her sleep is interrupted by pain and the need to change positions every thirty to sixty minutes.  (<u>Id.</u> at 266.)  She needs help dressing and with certain grooming tasks, e.g., brushing her hair.  (<u>Id.</u>)  On a day when she is not bedridden, she cannot work at any tasks for longer than ten to fifteen minutes without having to rest. (<u>Id.</u> at 258.)  If she goes to the doctors, she is bedridden for the next one to two weeks.  (<u>Id.</u> at 258, 267.)  Most of her day is spent trying to find a comfortable position.  (<u>Id.</u> at 258.) She leaves the house only for doctors visits "and maybe once a year."  (<u>Id.</u> at 267.)

Plaintiff's counsel completed another Disability Report on her behalf after the initial denial of her application.  (<u>Id.</u> at 281-96.)  As of June 18, 2008, Plaintiff had burning pain – "pins and needles" down her legs and feet – and a burning feeling in her arms accompanied by a loss of sensation to hot and cold.  (<u>Id.</u> at 281.)  She had last seen Dr.

Poetz in June 2006 and had another appointment in July 2008.  (<u>Id.</u> at 282.)  Dr. Poetz had referred her to Vic Zuccarello for a functional capacity examination in March 2008.  (<u>Id.</u> at 287.)  Her only medication was extra strength Tylenol.  (<u>Id.</u> at 288.)

Plaintiff's earnings records reflect employment from 1980 to 2002, inclusive, with the exception of 1992.  (<u>Id.</u> at 202.)  Her highest earnings were $26,133.56, in 1997; her lowest were $287.50, in 1980, and her next lowest were $1,030.55, in 1982.  (<u>Id.</u>)  During the 22 years in which she had reported earnings, her annual income was between $10,00.00 and $20,000.00 in ten years and greater than $20,000, i.e., $26,133.56, in one.  (<u>Id.</u>)

As noted above, also before the ALJ was a transcript of Plaintiff's deposition taken in May 2006 in her workers' compensation claim against Wal-Mart.  (<u>Id.</u> at 110-99.)

The medical records before the ALJ of physicians or family nurse practitioners (FNPs) are summarized below in chronological order followed by the records of Logan Chiropractic College.

On March 2, 2001, an x-ray of Plaintiff's cervical spine revealed slight narrowing of the C5-C6 interspace and was otherwise negative.  (<u>Id.</u> at 551.)  At the request of Amita Bhalla, M.D., Plaintiff's physician, on March 23 she had a computed tomography (CT) scan of her head to investigate her complaints of dizziness, slurred speech, and difficulty walking; the scan was within normal limits.  (<u>Id.</u> at 552.)

On April 3, 2002, Plaintiff consulted Dr. Bhalla about a blister in her mouth for the past two months that was not healing and pain in her left rib cage.  (<u>Id.</u> at 678.)  She

reported that she was seeing a chiropractor for the pain and was doing a lot of lifting at work. (Id.) She was diagnosed with a growth in her oral mucosa and costochondritis. (Id.)

Plaintiff was seen by a FNP, Lisa Akers, at Unity Corporate Health ("Unity") on April 5, describing pain to the left ribs, chest, and side that occasionally radiated to her back. (Id. at 309-12, 332-34, 432, 441-42.) The pain was sharp and inconsistent. (Id. at 309.) Resting alleviated the pain; walking and standing aggravated it. (Id.) The pain prevented her from working. (Id.) She was not taking any medication. (Id.) On examination, her vital signs were stable and she was tender to the left ribs and chest. (Id.) It was difficult, however, to assess her because she was "guarding." (Id.) The diagnosis was left rib strain. (Id.) She was to go to her primary care physician if she continued to have chest pain. (Id.) X-rays of her left ribs and of her chest were negative. (Id. at 309-11, 441-42.) An electrocardiogram (EKG) was performed and was to be read by a cardiologist. (Id. at 309, 312, 430.) She was to see Dr. Fischer on April 11 and was placed on restricted duty until then. (Id. at 309.) The restricted duty prohibited Plaintiff from lifting anything over ten pounds and pushing or pulling anything over twenty pounds. (Id. at 307.) She had limited use of her left hand and had to alternate sitting and standing. (Id.)

Plaintiff did not keep her April 11 appointment. (Id. at 313, 335-36.) Plaintiff was seen on April 26, at which time she reported that the pain might be "a little bit better." (Id. at 315, 337, 433.) Her main complaint was the left pectoralis, which was tender when touched and painful with any motion. (Id.) The physician, Carlos Pappalardo, M.D.,

advised her to take Aleve and apply mild heat.  (Id.)  Plaintiff was to be seen again on May

2, but did not keep that appointment.  (Id. at 313, 315.)

Plaintiff was seen at Unity by FNP Lisa Thompson on January 31, 2003.  (Id. at 317-

18, 418, 434-35.)  It was noted that the EKG was within normal limits.  (Id. at 317.)

Plaintiff reported that she had been unable to return to work because of her medical

problems.  (Id.)  She had continued pain to her left chest wall and ribs, difficulty sleeping,

and inability to do anything other than her exercises and walking.  (Id.)  Her pain was an

eight on a ten-point scale.  (Id.)  She appeared to be in acute distress and walked with a very

guarded posture to the left side.  (Id.)  Even mild palpation of her left chest and rib area

produced explicit pain.  (Id.)  Upper extremity strength testing on the left was decreased

compared to the right.  (Id.)  Flexion, extension, and lateral flexion on the left were very

restricted.  (Id.)  The diagnosis was continued left rib pain.  (Id.)  She was to remain off

work until the type of problem she was having was determined.  (Id.)  She was to have a

bone scan.  (Id. at 318.)  She did; the scan revealed subtle abnormalities involving the T9-

T10 and T4-T5 regions of the thoracic spine.  (Id. at 319-20, 419-22, 424-25.)

Plaintiff was seen again by Ms. Thompson on February 17.  (Id. at 323-24, 436.)  She

reported that the medications previously prescribed, Ultram (tramadol)[13] and

cyclobenzaprine, a muscle relaxant, had given her no relief.  (Id. at 323.)  Her pain was a

seven to nine on a ten-point scale, was constant, and was not relieved by lying down or

_____

[13]Ultram is prescribed for the management of moderate to moderately severe pain. Physicians' Desk Reference, 2399 (55th ed. 2001) (PDR).

- 13 -

moving.  (Id.)  An x-ray revealed increased spurs at the inner space anterior of T6 trough T11 with no wedge deformity and no fracture.  (Id. at 323, 431)  Plaintiff was prescribed Vicodin.[14]  (Id. at 323, 324.)  Ms. Thompson noted that any further treatment would have to be authorized by the insurance company.  (Id. at 323.)  She diagnosed Plaintiff with "[p]ossible" costochondritis.  (Id.)

Plaintiff was seen again at Unity on February 28.  (Id. at 326, 437.)  She reported to Stuart Bogner, M.D., that the Vicodin was keeping her awake.  (Id.)  She informed him that most of her discomfort was on her left side.  (Id.)  She rated her pain as an eight.  (Id.)  On examination, she had very limited upper body rotation.  (Id.)  She was given a refill of the Vicodin and advised to try Benadryl at night.  (Id.)  She was to return on March 14; she did and was seen by Ms. Thompson.  (Id. at 326, 328-29, 438-39.)  She reported that the Vicodin was making her itch.  (Id. at 328.)  Ms. Thompson described the exam as being "basically unchanged" from the previous one.  (Id.)  Plaintiff was to have a magnetic resonance imaging (MRI) if authorized by the insurance company and then have an independent evaluation by Dr. Anthony Margherita.  (Id.)  Ms. Thompson opined that the mechanism of Plaintiff's injury did not "totally match with her current symptoms . . . ."  (Id. at 329.)

The MRI of Plaintiff's thoracic spine revealed T9 and T10 bone marrow edema limited to the anterior portions of the vertebral bodies adjacent to the T9-T10 disc space and

---

[14]Vicodin is also prescribed for the relief of moderate to moderately severe pain.  PDR at 1630.

T9-T10 degenerative disc dessication without any evidence of disc bulge or protrusion.  (Id. at 340, 412.)

After a year's absence, Plaintiff returned to Dr. Bhalla on April 11 with complaints of pain in her left rib cage that started after she lifted a box of mouth wash weighing less than ten pounds.  (Id. at 677-78.)  After she started seeing a chiropractor pain in her left arm had gone away but the pain in the left side of her chest continued.  (Id. at 678.)  She was unable to take a deep breath without pain.  (Id.)  She had tried Lodine, but could not tolerate it, and Vicodin, but she had an allergic reaction to it.  (Id.)  Results of the MRI and bone scan were not available.  (Id.)  On examination, Plaintiff was tender around the fourth and fifth left costochondral junctions.  (Id. at 677.)  She was advised to try Celebrex, to get the results of the various tests, and to see an orthopedist if her pain continued.  (Id.)  Plaintiff was contacted the next month to make a follow-up appointment.  (Id.)  She made one for May 30, but cancelled it, explaining that she was seeing Dr. Margherita and a chiropractor and that the Lidoderm patches were helping with her pain.  (Id.)

Plaintiff was seen by Dr. Margherita on April 28, after failing to show for an appointment five days earlier.[15]  (Id. at 355, 361-70, 372, 397-411.)  After conducting an examination of Plaintiff's stance and gait, cervical, thoracic and lumbar spines, and of her neurological functioning, Dr. Margherita noted, inter alia, that her fine motor coordination was normal, her fine finger movements were normal bilaterally, and she had no significant

---

[15]She had also failed to keep a March 24, 2003, appointment with Dr. Margherita.  (Id. at 413.)

muscle atrophy.  (Id. at 368-70.)  Her muscle strength was 5/5 in all muscles tested.  (Id. at 370.)  His impression was of possible sympathetically mediated pain at the lower T-spine segments and unclear costochondral symptomatology.  (Id.)  She was to have a bone scan to help pinpoint the reason for her symptoms and was given a prescription for Ultram.  (Id.)  The bone scan revealed mild uptake in the manubrium[16] and sternum; symmetrical uptake throughout the costochondral junctions bilaterally; faint decreased uptake in the proximal aspect of the left ninth and tenth ribs; faint uptake of the radiotracer in the breast parenchymal bilaterally; a mild degenerative change in the costovertebral junction on the left from T2 to T10 and on the right from T3 to T10; and mild facet arthropathy[17] at T12-L1.[18]  (Id. at 352, 371, 378.)

Plaintiff consulted Larry Oteham, D.O., with Rockwood Medical, LLC, on July 31.  (Id. at 754-57, 759-62.)  He prescribed a medrol dose pack for the costochondritis, protonix for her gastrointestinal reflux disease (GERD), and Paxil for general anxiety.  (Id.)  Her cholesterol levels were high; a strict diet was recommended.  (Id. at 756.)  Plaintiff returned on August 7, complaining of left-sided rib pain, fatigue, and lack of energy.  (Id. at 753,

_____

[16]The manubrium is "[t]he portion of the sternum . . . that represents the handle." Stedman's at 1063.

[17]Arthropathy is "[a]ny disease affecting a joint."  Stedman's at 150.

[18]Dr. Boesch had written "To Whom It May Concern" on April 28, 2003, recommending that Plaintiff have a triple phase single photon emission-computed tomography (SPECT) scan to determine whether there was a chronic soft tissue injury or arthritis. (Id. at 518, 520.)  Subsequently, Dr. Margherita ordered one of Plaintiff's left ribs, thoracic spine, and left costochondral joints.  (Id. at 519.)

763.)  She attributed both to the Paxil.  (Id.)  Dr. Oteham advised her to continue taking the Paxil and protonix.  (Id.)  Four days later, Plaintiff informed him that she had started taking the Paxil and protonix, but had stopped because of a racing heart, sweating, itching, vertigo, lethargy, diarrhea, facial numbness, anxiety, nausea, and pain.  (Id. at 752, 764.)

Plaintiff returned to Dr. Margherita on September 2.  (Id. at 356, 359, 375, 377.)  He noted that it was "unclear why there was such a delay in her returning to the office for re-evaluation" after the initial evaluation in April.  (Id. at 356.)  He also noted that her records from Logan Chiropractic demonstrated a variety of findings, "none of which clearly match [her] reported symptom complex."  (Id.)  She reported that her symptoms had improved on the Lidoderm patch,[19] prescribed after her last visit.[20]  (Id.)  After examining Plaintiff, Dr. Margherita noted that Plaintiff's "focused examination and clinical findings demonstrate subjective allodynia[21] in the anterior chest wall and some hypersensitivity in the anterior chest wall that does not correlate with her bone scan findings."  (Id.)  He "remain[ed] concern given the rib uptake noted on scan that she may have a component of neuropathic pain or sympathetically mediated pain/RSD."  (Id.)  She was to continue on the Lidoderm and begin taking Neurontin.  (Id.)  He also noted that, due to Plaintiff's delay in returning

[19]Use of the Lidoderm patch is indicated for "relief of pain associated with post-herpetic neuralgia."  PDR at 1204;

[20]Indeed, Plaintiff reported to her chiropractor on May 6 that the Lidoderm had taken the edge off her pain and reduced it to a four out of ten.  (Id. at 390.)

[21]Allodynia is a "[c]ondition in which ordinarily nonpainful stimuli evoke pain."  Stedman's at 50.

to the office and her somatically focused complaints, she would have to be closely monitored to verify her compliance with treatment. (Id.)

A September 18 notation in Dr. Oteham's records reports that Plaintiff thought she was having withdrawal from Neurontin. (Id. at 751, 765.) It was noted that she was able to take tramadol. (Id.)

Plaintiff was to return to Dr. Margherita's office on September 22, but she did not. (Id. at 357, 373.) Instead, she went on September 28, when he was not there. (Id.) She was then to return on October 2, but did not. (Id.) She did keep an October 14 appointment. (Id. at 357, 373, 376) She reported that she had continued to go to Logan Chiropractic, that the Lidoderm was not helpful, and that the Ultram caused swelling. (Id. at 357.) Dr. Margherita noted the lack of any indication that Plaintiff had contacted his office about this side effect. (Id.) After reviewing the chiropractic records, he reported that he could not "identify a reason or justification for the prolonged treatment" Plaintiff had received there. (Id.) After examining Plaintiff, he concluded that he could "not identify any clearly objective findings that would preclude her from being able to undertake her usual and customary work activities," with the exception of needing to "avoid bending at the waist, especially with rotation." (Id.) With the use of proper mechanics, her only limitations were her "subjectively reported pain complaints." (Id. at 357-58.) He recommended that Plaintiff be evaluated by Dr. Bakul Dave to investigate the issue of RSD. (Id. at 358, 374.) A few weeks later, he wrote to the insurer for Wal-Mart, reporting that he was unable to determine

the nature of the reported chest wall pain and recommending that she be evaluated by Dr. Dave. (Id. at 355, 372.)

Plaintiff first saw Robert Poetz, M.D., on November 8 for an evaluation of the sharp pains in her rib area and other symptoms. (Id. at 694-95.) She next saw him on January 24, 2004. (Id. at 688, 704.) Writing to her attorney about this visit, Dr. Poetz summarized Plaintiff's visits to Dr. Bhalla, Unity Corporate Health, Dr. Margherita, and Dr. Oteham. (Id. at 689-90, 705-06.) He noted that Plaintiff had not had further treatment after the November 2003 visit to him. (Id. at 690, 706.) On examination, Plaintiff was alert, cooperative, moved about the room in no apparent distress, and ambulated with a normal gait. (Id. at 691, 707.) She took ibuprofen as needed for pain. (Id.) Her pupils were equal, round, and reactive to light and accommodation. (Id.) She wore corrective lenses. (Id.) She had a left anterior chest wall nodule with mild tenderness at the second and third rib space. (Id.) She moved the joints of her upper and lower extremities well and without deformity. (Id. at 691-92, 707-08.) Her hands and feet were neurovascularly intact with good capillary refill. (Id.) She had a good range of motion in her cervical, thoracic, and lumbar spines. (Id. at 692, 708.) Straight leg raising[22] was negative in a seated and supine position. (Id.) Her deep tendon reflexes were intact. (Id.) The diagnosis was costochondritis and complex regional pain syndrome as of March 31, 2002. (Id.) The

---

[22]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

treatment recommendations included warm moist packs; range of motion exercises; non-steroidal anti-inflammatory medication; the avoidance of heavy lifting, strenuous activity, and any other activity that exacerbated her symptoms or caused her disease to progress; stop smoking; and continue her pain management care for possible injections. (Id.) Dr. Poetz opined that Plaintiff had a 50% permanent partial disability to the body as a whole as measured at the chest as a result of her March 2002 injury. (Id.)

On the same day Dr. Poetz wrote to the insurance carrier, Stephen G. Smith, M.D., of the Chesterfield Pain Management, wrote to him after examining Plaintiff. (Id. at 479-80.) He reported that Plaintiff described her pain as intermittent and sharp, dull and achy, and can be burning. (Id. at 479.) The pain was increased by car rides, changes in the weather, raising her harm above 90 degrees, and coughing and sneezing. (Id.) Her pain was decreased with ice, massage, and acupressure. (Id.) Her sleep was sometimes altered by her pain. (Id.) On examination, Plaintiff was in no apparent distress. (Id. at 480.) She had a relatively normal range of motion in her neck without significant discomfort, and a muscle strength of 5/5 with flexion and extension of her fingers, wrists, elbows, and abduction and adduction of her shoulders. (Id.) She had discomfort with activity of her left upper extremities. (Id.) Palpation over her upper chest and sternoclavicular and sternocostal junctions were all tender, as was her serratus anterior musculature on her left. (Id.) Her tenderness was "very diffuse." (Id.) Dr. Smith could not determine the etiology of her problem. (Id.)

On February 2, Harry Eggleston, M.D., an ophthalmologist, examined Plaintiff. (Id. at 482-90.) Plaintiff reported visual difficulty with driving since the previous Saturday. (Id. at 490.) She wore glasses and her current prescription was approximately two years old. (Id.)

Dr. Bhalla wrote a letter on July 16 "To Whom It May Concern," informing the recipient that Plaintiff had been in her office on April 3, 2002, and was diagnosed with costochondritis. (Id. at 679.)

Plaintiff returned to Dr. Poetz on May 18, 2006. (Id. at 683, 699.) Writing again to her attorney, Dr. Poetz noted that Plaintiff had continued to have problems with pain in her chest and sternum and had seen Dr. Smith about this pain in January 2004. (Id.) He also noted that Plaintiff had experienced problems with depression since her March 2002 injury due to her continuing pain and inability to perform activities she formerly enjoyed. (Id. at 684, 700.) On examination, Plaintiff appeared to be in obvious distress and "ambulate[d] with an extremely slow antalgic gait." (Id.) She rated her pain as a ten out of ten on her worst days and a five out of ten on her better days, which were "very rare." (Id.) She had a depressed affect. (Id.) She took Tylenol once a month when the pain was severe; however, it was ineffective. (Id. at 685, 701.) She was allergic to aspirin and did not like to take medication. (Id.) She cried out in pain when touched lightly on her chest wall. (Id.) She guarded her left arm and reported that she could not lift it up without intense pain. (Id.) Her hands were as before, as were her feet and spine. (Id.) Dr. Poetz added depression to his previous diagnosis and dated it from March 31, 2002. (Id.) His recommended treatment

was as before, with the addition of avoiding prolonged sitting, standing, walking, stooping, bending, squatting, twisting, or climbing, seeing a psychiatrist, and taking Cymbalta for her pain and depression.  (Id. at 686, 702.)  He also recommended that she stop smoking because the nicotine acted as a stimulant and increased pain.  (Id. at 686.)  His assessment of her percentage of disability as measured at the chest wall was as before.  (Id.)  He additionally considered her to have a 30% permanent partial disability to the body as a whole due to depression and to be permanently and totally disabled as a result of her March 2002 injury.  (Id. at 687, 703.)  He opined that she was and would be permanently and totally unemployable.  (Id.)

At Plaintiff's attorney's request, Plaintiff was evaluated on August 3 by Susan L. Shea, M.A., a certified rehabilitation counselor.  (Id. at 710-32.)  After reviewing Plaintiff's medical history, complaints, and the DOT definitions of her past work, Ms. Shea concluded that Plaintiff was unemployable in the open labor markets of the state and national economies due to (a) Plaintiff's description of a level of pain which precluded work; (b) her allergic reactions to medications, making it difficult for her to obtain pain relief; (c) the limitations placed by Dr. Poetz on prolonged postures; (d) the lack of any treatment recommendations which would potentially return her to work; (e) the lack of any etiology for her pain by any of the physicians who have said she can return to work; (f) Dr. Margherita's recommendation that she be evaluated for RSD and for pain management modalities; and (g) Dr. Poetz's opinion that she is permanently and totally disabled.  (Id. at 711-23.)

On March 13, 2008, on Dr. Poetz's referral, Vic Zuccarello, a registered occupational therapist, attempted to perform a functional capacity evaluation of Plaintiff. (Id. at 733-37.) Only a few portions of the evaluation could be performed, however, due to her kinesiophobic[23] behavior. (Id.) He noted that Plaintiff had been observed sitting during the intake interview for forty-five minutes without shifting positions. (Id. at 735.) She was weight-bearing "slightly off the [right] lower extremity." (Id.) She was hypersensitive to palpation throughout her upper, middle, and lower back region, and had increased muscle density only at her bilateral upper trapezius. (Id.) The longest she stood at any single time was less than seven minutes and her total standing time was approximately fifteen minutes. (Id.) She walked 150 feet in 3:23 minutes. (Id.) She walked 300 feet from the parking lot to the building, and again out of the building after testing. (Id.) On testing, her cervical range of motion was slightly diminished in extension, left lateral flexion, left rotation, and right rotation. (Id.) There was no lumbar flexion. (Id.) Her range of motion in shoulder flexion and abduction was markedly limited, e.g., it was 60 out of 150 degrees on her left and 90 out of 150 on her right. (Id. at 736.) She had full opposition and composite finger flexion bilaterally. (Id.) "All active movements were accompanied by loud moaning and gasping." (Id.) It was noted that Plaintiff "displayed no active true lumbar flexion yet is able to sit complete upright with hips/knees/ankles in 90 degrees." (Id.) She tested well below the tenth percentile in fine motor coordination, and was observed signing documents with illegible cursive handwriting. (Id.) During this test she was also grasping, loudly

---

[23]Kinesiophobia is a "[m]orbid fear of movement." Stedman's at 920.

moaning, and crying. (Id.) She tested below the norm for her age and gender in grip testing, displaying "extreme pain behaviors." (Id.) At this point in the testing, Mr. Zuccarello deemed it advisable to stop testing. (Id.) He concluded that it was not possible to identify her current musculoskeletal impairment or her functional abilities and limitations. (Id. at 737.) He also could not make a judgment as to whether her pain behaviors and volitional functioning were the result of "Acceptable Effort, Over-guarding, or Possible Symptom Magnification." (Id.) He noted, however, that her extreme fear of bending was inconsistent with her ability to assume a similar posture when sitting upright. (Id.) Such inconsistency was "often observed in chronic pain patients whom have not had the benefit of physical therapy to restore function." (Id.) At Plaintiff's attorney's request, he clarified a few days later that Plaintiff could not perform her prior job. (Id. at 732.)

An April 30 letter from June M. Blaine, M.S., a certified rehabilitation counselor, summarized Plaintiff's complaints, noted that her medical records had been reviewed, and concluded that she did not have an explanation for Plaintiff's complaints and issues. (Id. at 738-39.) Also noting that the most recent medical records were from 2006, Ms. Blaine suggested referral to an ophthalmologist, physiatrist, and psychiatrist. (Id. at 739.)

Three months later, on July 17, Plaintiff returned to Dr. Poetz for re-evaluation of her complaints. (Id. at 742-43, 748-49.) She complained of severe chest and back pain made worse by deep breaths and any sudden movement. (Id. at 742.) She continued to have the same complaints as previously with the addition of numbness, cramping, and Charlie horses in her right arm and frequent falling due to her knees giving out. (Id.) She

presented with a disheveled appearance and appeared to be in obvious mental distress. (Id. at 743.)  She used extreme caution with any movement and constantly shifted between standing and seating positions. (Id.)  Dr. Poetz noted that Plaintiff had a psychiatric diagnosis of conversion disorder and required treatment. (Id.)  This disorder was also attributable to her March 2002 injury. (Id.)

Plaintiff received the majority of her treatment from the Logan Chiropractic Center (Logan).[24]

Plaintiff visited Logan three times in 2002 before her injury on March 31.  She first sought chiropractic treatment after the injury on April 1.  On a list of her various problems, the date of their first appearance, and the date, if any, of when they were resolved, rib sprain and strain is the tenth problem and has an onset date of April 1, 2002. (Id. at 553.) Segmental dysfunction is listed with an onset date of December 13, 1999, and is not resolved. (Id. at 553, 557.)

After her third visit, on April 4,  Ron J. Boesch, D.C., and Julie Addante, an intern at Logan, addressed a letter the same day "To Whom It May Concern." (Id. at 467, 550, 563.)  They wrote that an examination had revealed that Plaintiff had sprained rib ligaments and strained intercostal muscles. (Id.)  They would treat her with "spinal and costovertebral

_____

[24]Plaintiff's records from Logan reveal a steady pattern of seeking chiropractic care for various ailments.  For instance, she sought such treatment in 1998 for cervical sprain/strain and in January 2002 for hip pain and vertigo. (Id. at 564-70, 578.)  In total, she had 46 visits in April through December 1998, 44 visits in 1999, 26 visits in 2000, and 46 visits in 2001. (Id. at 579-676.)

manipulative therapy, interferential current at a frequency of 80-120 Hz, and cryotherapy"[25] and recommended that she not do any lifting until April 17 and avoid reaching overhead. (Id.)

Plaintiff sought chiropractic treatment at Logan 62 additional times in 2002. (Id. at 450-66, 470-78, 522-47, 571-78.) The number of monthly visits generally decreased from fourteen in April, ten in May, eight in June, seven in July and again in August, six in September, and four in October and again in November. (Id.) The number of visits increased in December to five. (Id.) Her progress during these treatments was not linear. For instance, on May 16, Plaintiff reported that she was 60% better overall. (Id. at 464.) Four days later, she was 50% better. (Id. at 463.) She had gone shopping for three hours and was experiencing increased muscle pain. (Id.) On May 28, she was not able to sit in a car. (Id. at 462.) On May 30, she reported that her pain had increased when she attempted to do laundry; eleven days later, she described the pain as intermittent. (Id. at 457-58.) On June 13, she reported that she had had trouble using scissors when grooming a dog, but had had no trouble brushing the dog. (Id. at 456.) Plaintiff reported on June 17 that she had been fishing and to the opera and was feeling better. (Id.) The next week, she had felt pain in her ribs after scraping wallpaper when she was feeling fine. (Id. at 455.) The week after that, on July 1, she reported having a great day the day before and doing housework. (Id. at 453.) Four days later, she was having difficulty breathing after

_____

[25]Cryotherapy is "[t]he use of cold in the treatment of disease." Stedman's at 416.

overdoing it the day before.  (Id.)  On July 19, she was doing better, but still was painful in her ribs and muscles.  (Id. at 452.)  On July 29, she said she had not felt good for the past four days, the ibuprofen was not helpful, and she had washed the floor.  (Id. at 451.)  On August 19, she complained of pain in her ribs; three days later, that pain was better but her lower back hurt.  (Id. at 450.)  On September 9, she reported being in constant pain; on October 10, she was greatly improved; on November 19, she was "somewhat better," the constant pain was going away, and her range of motion was improving.  (Id. at 473, 475, 477.)

Plaintiff sought chiropractic care 35 times in 2003.  (Id. at 380, 383-95, 468-70, 495, 497-500, 502-14, 516, 547-49.)  Specifically, she went four times each in January, February April, and May; five times each March, June, and July; and once in August, September, October, and November.  (Id.)  Again, her treatment and complaints did not follow a linear pattern.  At the March 3 visit, she reported that she would feel relief after treatment only to have pain and spasms return on car ride home and revealed that she had stopped taking her medication because of the side effects and allergic reactions.  (Id. at 394.)  On March 10, she reported that an effort at singing had exacerbated her pain and caused her extreme discomfort for three days.  (Id.)  At the April 14 visit, she reported that the doctor who had referred her to the chiropractic clinic was now "antichiropractic" and had suggested surgery for the spurs.  (Id. at 391.)  She was not happy.  (Id.)  On July 1, the sharp pain in her rib area was so severe that it took her breath away.  (Id. at 383-84.)  She had pain on palpation.  (Id. at 383.)  Plaintiff reported on July 8 that there had been no change after her last

- 27 -

adjustment.  (Id. at 383.)  She was not getting much sleep.  (Id.)  If she was sedentary for a long time, the pain was less.  (Id.)  During the SPECT scan of her left rib cage, she had been in extreme pain and was struggling for breath.  (Id.)  On July 17, the treating chiropractor recommended that Plaintiff have one to two treatments a week and be reevaluated in four weeks. (Id. at 380.)  On October 10, Plaintiff reported feeling "very well."  (Id. at 496.)

According to the records before the ALJ, Plaintiff had only two treatments at Logan in 2004 – both in March.  (Id. at 494.)  On March 20, she reported having sinus problems. (Id.)  The dosepack of antibiotics were helping with her "left eye blindness," which was possibly caused by sinus problems."  (Id.)

## The ALJ's Decision

The ALJ first noted that the relevant period of time before him was from May 17, 2005 – Plaintiff's adjusted disability onset date[26] – through December 31, 2007 – the date she was last insured.  (Id. at 8.)  After outlining the Commissioner's five-step sequential evaluation process, see pages 32 to 35 below, the ALJ found at step one that Plaintiff met the requirements for DIB through December 31, 2007, and at step two, that she had not engaged in substantial gainful activity during the relevant period.  (Id. at 8-10.)  The ALJ next found at step three that Plaintiff had severe impairments of costochondritis, degenerative disc disease, and possible somatoform disorder.  (Id. at 10.)   These

_____

[26]Plaintiff's onset date was adjusted by the Social Security Administration to May 17, 2005 – the day after an unappealed denial by an ALJ of Plaintiff's previous application.  (Id. at 253-54.)

impairments, singly or in combination, did not meet or medically equal an impairment of listing-level severity. (Id. at 11.) Specifically, the costochondritis did not satisfy Listing 1.02 because there was insufficient evidence that this impairment prevented her from being able to ambulate effectively or from performing fine and gross movements effectively. (Id.) The degenerative disc disease did not satisfy Listing 1.04 because there was no evidence of nerve root compression, spinal arachnoiditis, or lumbar stenosis resulting in the inability to ambulate effectively. (Id.) Her mental impairment did not satisfy Listing 12.07 because she had only moderate restrictions in her activities of daily living, mild difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation of extended duration. (Id. at 11-12.) Moreover, there was no objective evidence to support her allegation of being unable to do most activities without assistance and she denied having a mental impairment, had never required hospitalization for such, did not take any psychotropic medication, and did not engage in regular psychotherapy. (Id.)

Addressing the question at step four of Plaintiff's residual functional capacity (RFC), the ALJ determined that she had the RFC to perform sedentary work[27] except she needed to be able to rotate positions frequently; was limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, crawling, reaching in all directions, and reaching overhead; should avoid climbing ladders, ropes, or scaffolds; and should also

---

[27]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing." 20 C.F.R. § 404.1567(a).

avoid concentrated exposure to extreme heat, cold, pulmonary irritants, industrial hazards, and unprotected heights. (Id. at 12.) Because of her possible mental impairment, she was also limited to simple tasks and unskilled work. (Id.)

In assessing Plaintiff's RFC, the ALJ evaluated her statements about the intensity, persistence, and limiting effects of her symptoms. (Id. at 12-14.) He noted that numerous tests to determine the cause of her musculoskeletal pain had revealed only minor abnormalities. (Id. at 13.) And, the three phase bone scan ordered by Dr. Margherita had failed to produce any definitive results. (Id.) Dr. Poetz' assessment of a 50% disability and a total disability was discounted because he had failed to explain in detail what Plaintiff could do in terms of such activities as lifting, walking, sitting, and did not explain how 50% resulted in total disability. (Id.) A review of the medical records generated after the prior ALJ's adverse decision[28] demonstrated that Plaintiff had not been receiving medical care on a regular basis. (Id.) She testified she does not have a mental impairment and does not take prescription medication. (Id.) She never followed up on the recommendation that she be evaluated by an ophthalmologist, physiatrist, or psychiatrist. (Id.) Dr. Poetz recommended when seeing her in June 2006 that she take Cymbalta because she appeared depressed; there was no indication she did so. (Id. at 14.) Dr. Poetz' later opinion that Plaintiff had a conversion disorder and needed psychiatric care was discounted because he was not her treating physician and had been consulted to support her claim for benefits. (Id.) Although

_____

[28]Although earlier correctly identifying the year of that decision as "2005," the ALJ referred to it at this point as "2006." A reading of the ALJ's decision makes it clear that he knew that it was "2005" that was determinative year.

Plaintiff alleged she did not take prescription medication because of an aspirin allergy, there was no objective medical evidence to support her claim and it was questionable that there was no medication without aspirin in the wide variety of natural and synthetic pain medication currently available.  (Id.)  In short, Plaintiff's lack of medical care for her alleged severe chronic pain reflected negatively on her credibility.  (Id.)  And, although Plaintiff described limited daily activities, that description could not be objectively verified and, even if accurate, was not attributable to her medical condition, as compared to other considerations, in view of the relatively weak medical evidence and other factors previously discussed.  (Id.)

With her RFC, Plaintiff could not, however, perform her past relevant work.  (Id.)

Consequently, the ALJ reached the question at step five whether there were jobs existing in significant numbers in the state and national economies that Plaintiff could perform.  (Id. at 15-16.)  Based on the testimony of the VE and Plaintiff's age, education, work experience, and RFC, the ALJ concluded that there were such jobs, e.g., computer chip wafer breaker and security guard/monitor.  (Id.)  Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 16.)

### Additional Record Before the Appeals Council

Plaintiff submitted to the Appeals Council a February 2009 affidavit from Ms. Ehlmann averring that she helped Plaintiff with carrying or moving objects "of weight," reaching for items, walking, reading, doing laundry, shopping for groceries, and with transportation.  (Id. at 302.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of

impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577,

581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **<u>Wagner v. Astrue</u>**, 499 F.3d 842, 851 (8th Cir. 2007); **<u>Pearsall</u>**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **<u>Wagner</u>**, 499 F.3d at 851 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **<u>Id.</u>** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **<u>Singh v. Apfel</u>**, 222 F.3d 448, 452 (8th Cir. 2000); **<u>Beckley v. Apfel</u>**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **<u>Moore</u>**, 572 F.3d at 523; <u>accord</u> **<u>Dukes v. Barnhart</u>**, 436 F.3d 923, 928 (8th Cir. 2006); **<u>Vandenboom v. Barnhart</u>**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden at step five by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Accord **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). Cf. **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding for further proceedings case in which ALJ did not include undisputed, severe impairment in hypothetical question to VE).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a

whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547

F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir.

2001).  "'Substantial evidence is less than a preponderance but is enough that a reasonable

mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting

<u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record

to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that

fairly detracts from that decision.  **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188

F.3d 1047, 1050 (8th Cir. 1999).  The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at

1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d 730.  Thus, if

"it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, the [Court] must affirm the agency's decision."

**Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).  <u>See</u> <u>also</u> **Owen v. Astrue**, 551

F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as

the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### <u>Discussion</u>

Plaintiff argues that the ALJ's decision is not supported by substantial evidence  in

that he improperly (a) concluded that she did not satisfy the criteria of Listing 1.02; (b)

assessed her RFC; and (c) assessed her credibility.  The Commissioner disagrees.

Listing 1.02. Listing 1.02, "*Major dysfunction of a joint(s)*," requires an "inability to ambulate effectively" or an "inability to perform fine and gross movements effectively." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.02. An "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id. § 1.00 (2)(b)(1). An ability to ambulate effectively" requires that an "individual[] must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." Id. § 1.00 (2)(b)(2). The individual "must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." Id.

An "[i]nability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. § 1.00 (2)(c). An individual "must be capable of sustaining such functions

as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." Id. Examples of an inability to perform fine and gross movements effectively "include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." Id.

If Plaintiff's description of her inabilities at the hearing, to her doctors, and in the forms completed as part of the application process was accepted, she would clearly satisfy both criteria of Listing 1.02. She testified that she could not walk farther than ten to twelve feet and even so had to lean against something permanent for guidance and support. She described in her supporting application documentation a very limited ability to walk. Other than her reports, the medical records, however, do not support the limited ability to ambulate that she describes. Indeed, as noted by the Commissioner, Drs. Smith and Margherita both reported that she had 5/5 muscle strength in her lower extremities. Dr. Smith additionally described her as having a normal gait. Dr. Poetz, who saw her three out of four times as a consulting physician, described her joints as moving well.

Plaintiff cites the results of the bone scan and MRI as objective evidence of her inability to ambulate effectively. These test results were before Drs. Margherita and Poetz; however, neither considered them as sufficient to support Plaintiff's claims of disabling pain. Indeed, Dr. Margherita, a FNP, who had access to the MRI, and the chiropractor, who suggested the SPECT, noted that Plaintiff's symptoms were not explained by the tests.

Plaintiff further argues that any deficiencies in the objective record should have been cured by the ALJ by developing that record and sending her for a consultative examination.

It is well established that the ALJ has a duty to fully and fairly develop the record, "'independent of the claimant's burden to press [her] case.'" **Cox v. Astrue**, 495 F.3d 614, 618 (8th Cir. 2007); accord **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004). This duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources, including treating physicians, and ordering consultative examinations *if* "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004). If, however, a crucial issue is not undeveloped or there was no resulting prejudice or unfair treatment, the ALJ is not required to seek additional evidence. See **Goff**, 421 F.3d at 791; **Stormo**, 377 F.3d at 806. Moreover, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010). In the instant case, no crucial issue was undeveloped, nor was there any resulting prejudice or unfair treatment. See e.g. **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

Plaintiff also contends that she satisfies Listing 1.02 because of her inability to effectively perform fine and gross movements. Again, the success of this argument depends

on her descriptions of her limitations being found credible. The ALJ did not find them so, and that assessment is supported by substantial evidence, as discussed below.[29]

Plaintiff's RFC and Credibility. As noted above, an ALJ must evaluate a Plaintiff's credibility when assessing her RFC. Plaintiff argues that the ALJ erred when assessing her credibility and, consequently, erred when assessing her RFC. It is undisputed that Plaintiff would be disabled if her descriptions of her abilities was found to be credible.[30]

"In assessing a claimant's credibility, the ALJ must consider all of the evidence relating to the subjective complaints, the claimant's work record, observations of third parties, and the reports of treating and examining physicians." **Dipple v. Astrue**, 601 F.3d 833, 836 (8th Cir. 2010). Also relevant are "the claimant's daily routine; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions." **Id.** at 836-37. "Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely

---

[29]Plaintiff counters that both Mr. Zuccarello and Ms. Blaine were not able to complete their functional capacity evaluations because of Plaintiff's pain. The evaluations were stopped because of Plaintiff's *report* of pain. On the other hand, Mr. Zuccarello noted that Plaintiff sat for forty-five minutes without shifting positions, was able to sit upright, and walked the 300 feet between the parking lot and building.

[30]The Court notes that the issue of Plaintiff's credibility also negates her reliance on the reports of Ms. Shea and Ms. Blaine. Ms. Shea's conclusion about Plaintiff's inability to work is unavailing because it was predominantly based on her description of her limitations and her reported allergy to pain medication. Ms. Blaine simply reported that she could not explain what was wrong with Plaintiff. Also, Ms. Shea's conclusion that Plaintiff was unemployable "concern[s] issues reserved to the Commissioner" and does not receive controlling weight. **Vossen**, 612 F.3d at 1015.

because they are unsupported by objective medical evidence." **Halverson v. Astrue**, 600

F.3d 922, 931-32 (8th Cir. 2010). Moreover, the ALJ is not required to discuss each of these

factors when, as in the instant case, "'he acknowledges and considers the factors before

discounting a claimant's subjective complaints.'" **Id.** at 932 (quoting <u>Moore</u>, 572 F.3d at

524).

The ALJ considered the lack of objective medical evidence to support Plaintiff's

complaints, but he did not reject those complaints only because of this lack. The ALJ also

noted Plaintiff's failure to seek aggressive treatment and take prescription medication. These

failures are inconsistent with her subjective complaints. <u>See</u> **Spradling v. Chater**, 126 F.3d

1072, 1075 (8th Cir. 1997) (ALJ properly considered claimant's failure to seek more

aggressive treatment when assessing his credibility); <u>accord</u> **Black v. Apfel**, 143 F.3d 383,

386 (8th Cir. 1998). During a period when Plaintiff sought regular and frequent chiropractic

treatment, she missed appointments with her treating physicians or other health care

providers that could order tests and prescribe medication. <u>See</u> **Gwathney v. Chater**, 104

F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for alleged

physical and mental impairments contradicts subjective complaints of disabling pain). For

instance, in 2002 she sought chiropractic treatment 63 times after her injury; during this

same period, she saw her treating physician once and the Unity health care providers twice.[31]

Although suffering from allegedly debilitating symptoms, she inconsistently took prescribed

medication and inconsistently complained of side effects. Indeed, Dr. Margherita noted that

---

[31]Indeed, Plaintiff missed as many appointments with Unity in 2002 as she kept.

she did not contact him about a side effect and that her compliance with treatment would have to monitored. Additionally, her complaints about the effectiveness of prescribed medication were inconsistent. For instance, she told one health care provider that the Lidoderm was effective and another provider that it was not. She testified that her failure to take medication was due to her aspirin allergy and that she had been told that 85% of medications included aspirin. This statistic does not appear in her medical records; her attribution of her failure to take medication to her dislike of it does appear.

Also, as noted by the ALJ and the Commissioner, Plaintiff never sought any treatment or medication for two mental impairments diagnosed by Dr. Poetz despite his recommendations to do so. "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility." **Guilliams**, 393 F.3d at 802; accord **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008). See also **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010) (claimant's noncompliance with doctor's treatment instructions supported adverse credibility determination). Indeed, Plaintiff testified that she does not have a mental impairment.

Plaintiff also failed to stop smoking despite Dr. Poetz' recommendation that she do so to decrease her pain. See **Mouser**, 545 F.3d at 638 (claimant's failure to stop smoking after being instructed to by doctor was properly considered as detracting from his credibility).

Plaintiff argues that any failure to seek aggressive treatment is attributable to her lack of insurance and funds. A lack of sufficient financial resources to follow prescribed or

recommended treatment to remedy a disabling impairment may be "justifiable cause" for such noncompliance. **Brown v. Barnhart**, 390 F.3d 535, 540 (8th Cir. 2004). In order to be such cause, there must be evidence that the claimant was denied medical treatment due to financial reasons. **Goff**, 421 F.3d at 793. See also **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case in which there was no evidence that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay). Such evidence is lacking in the instant case.[32]

Additionally, the Court notes that Plaintiff testified that she smokes one-half pack of cigarettes a day. In **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999), the Eighth Circuit Court of Appeals rejected a similar reason for the absence of medical treatment or

---

[32]Citing **Pate-Fires v. Astrue**, 564 F.3d 935, 945 (8th Cir. 2009), Plaintiff also argues that a failure to seek regular, frequent medical treatment and to follow such treatment when recommended does not detract from credibility when it is attributable to a mental impairment. There is no evidence in the record to suggest such in the instant care. Indeed, as noted above, Plaintiff sought regular, frequent chiropractic treatment during the same period when she was not keeping medical appointments.

Plaintiff also cites **Moss v. Astrue**, 555 F.3d 556 (7th Cir. 2009), in support of her argument that the lack of treatment should not detract from her credibility. In that case, the Seventh Circuit found that the ALJ had improperly failed to question the claimant about a gap in treatment or a failure to obtain a customized ankle brace because of problems with insurance coverage. **Id.** at 562. In that case, however, there was evidence that the ALJ's recitation of the record was misleading or inaccurate and that clarification would have been relevant. There is no such evidence in the instant case.

Plaintiff further argues that the Commissioner's and ALJ's "repeated assertions that Plaintiff should have somehow gone out and sought out treatment borders on callousness." (Reply Brief at 3.) The Court respectfully disagrees. The only evidence before the ALJ was that Plaintiff lacked insurance, had not sought regular medical treatment, and did not drive. The other factual allegations referred to in her reply brief, e.g., the split with her boyfriend and limited public transportation, were not before the ALJ and were not proffered by Plaintiff as a reason for her lack of medical treatment. Indeed, no reason was given by Plaintiff for her lack of medical treatment.

prescription medicine on the grounds that there was no evidence to suggest that the claimant had "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication."

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted) <u>accord</u> **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  14th  day of September, 2010.